Lavoho, L.L.C. v. Apple Inc. Diesel Books v. Simon & Schuster. Good morning, Judge Hall, and may it please the Court, Derek Ho for the appellant, Diesel E-Books. This case is different from the prior one, it has a different record, and so I'd like to start with one fact that I think is more than sufficient by itself to create a jury issue as to whether Diesel E-Books, as opposed to Books on Board, was dead on arrival when agency hit, and that is in May of 2010, Macmillan's president of sales, Allison Lazarus, wrote an internal e-mail that called Diesel E-Books one of the forward-looking indies that has a viable e-book business. That's May of 2010, just one month after the agency pricing conspiracy was implemented. Now the defendants can say all they want and make lots of arguments about why there might have been other problems, but if the argument is that there was no but for causation because the conspiracy here was the equivalent of shooting a corpse that was already dead, there is a silver bullet piece of evidence in our case that I think, again, creates a jury issue at the very, very least. Let me also address the financial situation of Diesel E-Books, which also was different from Books on Board. To Judge Kearse's question, Diesel E-Books had been profitable prior to April of 2010. Now the profitability went up and down, and I agree wholeheartedly with Mr. Bleacher's comment that the measure of success in a nascent business like e-books is not necessarily profit, but revenue. Lots of companies, when they're starting up, are trying to generate more revenue, even if they're not making a profit on a month-over-month basis. But Diesel E-Books was profitable in 2008 and 2009, unlike Books on Board. And so given- The argument that there is a lot of evidence, Diesel's own evidence, to show that it really wasn't operating on a discounted price model, that it actually charged, on average, higher prices than Amazon and Barnes & Noble, et cetera. And that undercuts the issue as to whether it's an antitrust injury related to the antitrust violation in question. First of all, the defendant's characterization simply ignores plaintiff's own evidence, and that evidence consists of the declaration of Mr. Redford, who was Diesel's CEO, who explained in great detail that Diesel E-Books, in fact, did price backlist titles lower than Amazon. This is at page 1234 of the joint appendix. That's his declaration, and it's reaffirmed in his deposition at page 1251. He explains, moreover, that Diesel had what's called scraping technology, which means that you can use software to go out and actually figure out, on a nightly basis, what Amazon's prices are. And he used that technology to make sure that they were pricing below Amazon's prices. And although we did not put this in the record because we did not feel the need to, we put in pages from Diesel's website at the time, before agency, that we found on what's an established archive of the World Wide Web called the Wayback Machine. And if you look at that archive, it demonstrates that there are many bundles of E-Books that are being sold at less than $9.99 per book, some as low as $5. On this issue, the district court wrote that Diesel's E-Book prices were higher than those of Amazon or Barnes & Noble, indeed, on average, substantially higher. Is that disputed, or is that disputable? The reason for that, Judge Chin, is that what she's ignoring is title mix. Frontless titles, like New York Times bestsellers, are priced at a very low price. You always see them on sale, 30% off, 40% off. Backlist titles are not so heavily discounted because they're not the rage of the moment, and so publishers price them at a higher price. The reason that Diesel's average prices were higher was that Diesel was focused on selling backlist titles, not frontlist titles. So yes, it's true that the average price was higher, but again, Judge Coate misunderstood the significance of that fact. It does not at all undermine Diesel's argument and the sworn testimony of Mr. Redford that Diesel was trying to undercut Amazon's prices as to the books that it actually sold. The focus on backlist titles was, as the bread and butter of Diesel's business, was core to its strategy. It was precisely because all the publishers were so heavily discounting the frontlist titles that Diesel said, look, we're going to focus on the backlist titles. Your argument is that Judge Coate's observation, or I don't like to use the word finding when we're talking about summary judgment, but her conclusion based on the facts is immaterial. That she drew the wrong inferences from the observation about the average price. The question, I think, about... She focused on the wrong set of objects that were being sold. Because she was focused on average without looking at whether you were really comparing apples and oranges. And here you are. It's like saying that Lexus has higher average prices than Toyota. Yes, they do, but they're selling different things. And here, we were selling different things than Amazon is, a much narrower set of higher priced books. And really, this is part and parcel of the problem on a summary and why it was erroneous for Judge Coate to try to weigh all of this evidence and try to assess for herself its significance. These are issues that have been addressed by all of the experts. There was a quintessential classic battle of the experts about whether or not Diesel eBooks was injured by the antitrust conspiracy here. Our experts said that it was. Their experts said that it wasn't. There are these facts out there about finances and alternative causes, but the significance of those facts is not undisputed. And she drew all of the inferences from those facts in the defendant's favor rather than the plaintiff's. As to what I imagine Mr. Silbert is going to get up here and say about contemporaneous comments, I would implore the court to look at the comments that Mr. Silbert alludes to in his brief. We're talking about blog posts, musings online. These are not the kinds of things that conclusively refute sworn testimony. In Scott v. Harris, which is the Supreme Court's more recent summary judgment ruling, the kind of thing that you can use to overcome sworn testimony is a videotape. Something that is really, truly irrefutable. But prior comments on a website, to the extent that they even do contradict what Mr. Redford said in his sworn declaration, that's not the kind of stuff that allows you to ignore sworn testimony on the summary judgment motion. I see that my red light is on, so with the court's permission, I'll reserve the remainder of my time. You may have the three minutes you asked for if you want, so Mr. Silbert. Thank you, Judge Hall. So, Diesel's position on these issues now is the exact opposite of Diesel's position before I brought this lawsuit. Before bringing this lawsuit, Diesel said over and over again that when agency pricing was introduced, it helped Diesel to compete. And it articulated the benefit of agency pricing specifically in terms of competition. So when agency was first introduced, Diesel said, now we can compete against stores with a lot more resources. And then six months later, Diesel's CEO, Scott Redford, took it upon himself to write about what he had experienced as the benefits of agency, and the word he used for the benefit to Diesel was competition. He said, we don't have to lose our shirts to price cutting anymore. So here today, you have Diesel saying, you know, our whole business model was based on competing price competition on these backlist titles, and the agency model came along and prevented us from competing, and then four years later, our business failed, and that was because of agency. That's their position now. Their position before bringing this lawsuit was the agency system is allowing them to compete because their prices were significantly higher than Amazon's and Barnes & Noble's. And when I say significantly higher, as Judge Coates said, let me put that into perspective for you. Okay? So as Mr. Redford confirmed in his deposition, Diesel's wholesale price, its price of acquiring an e-book from a wholesaler, was 60% of the list price. Now in comparison, Amazon's price of acquiring the e-book was 50% of the list price. So even at the starting gate, Diesel is paying 20% more per e-book than Amazon is, and then Amazon is selling those e-books at or around its costs or sometimes below. So if you look in the Carlton report, you can see the average prices that Amazon charged for e-books in the period preceding agency. Those prices hover right around 50% of list price, right around Amazon's costs, sometimes a little lower. Diesel, on the other hand, is buying the e-book at 60%. So Amazon is selling the e-books to consumers, to you and me, for less money than Diesel can buy the e-book itself to put it on its shelves. And then, Diesel's markup during that period is over 27%, 27% over its cost, its average markup, and that includes any bundle, any reward, any discount that Diesel says it offered. It all averages out to a 27% gross profit margin over Diesel's already very high cost of 60%. Can you talk about the apples and oranges argument that we're talking about? Great question. So I think when you conference this case, I would urge you to open the joint appendix to page 316 to 319, okay? And what you will find there is the deposition testimony of Dr. Ratliff, which is the plaintiff's expert in this case and also in the books on board case. And at those pages, Dr. Ratliff is asked repeatedly whether there is any evidentiary basis for the claim that Diesel sold a different mix of e-books, that it discounted any particular mix of e-books, that it discounted backlist versus frontlist, any evidentiary or quantitative basis for a claim that would support the idea that Diesel was discounting those particular books. And his answer is no, no, no. So what you have is now the plaintiff is saying, gee, our whole business model was premised on discounting these particular books and we were a discounter. That was our secret. That was the special sauce. But at the time, what they were saying was the exact opposite. They were saying we can't compete because Amazon's prices are so low. But finally, when the agency system comes into place, now Diesel can compete because pricing is uniform. And they specifically, again, put that benefit in terms of competition and again, never once before bringing this lawsuit do they ever say that agency pricing has harmed them. Now let me touch upon the outage. We heard a little bit about that. It's the same analysis here as it is in books on board. Let me just make sure that you understand what the outage is and then I will explain why Judge Coate correctly held that the outage is not antitrust injury. The outage happened during the transition to agency. It affected some retailers but not others. It was a temporary delay or interruption in the wholesale supply chain as wholesalers signed on to new agency contracts with each publisher individually and then also signed on with the retailers who the wholesalers worked with like Diesel. Was it a reasonably foreseeable result of the anti-competitive behavior? It was not foreseeable and even if it was, it would not be antitrust injury. Okay? It was not foreseeable because it depended on the- It's not an injury in and of itself. It causes an injury downstream because of other things. Tell me why it's not. It's not- Tell me why it's not reasonably foreseeable first. It's not reasonably foreseeable because it depends on what's going on at the wholesaler. The wholesaler has to make changes within its systems to do tax collecting and tax reporting. The publishers do not have visibility necessarily into that. It depends on factors that are outside the publisher's control. Foreseeability is not the test anyway. If you want to see the test for antitrust injury, I think that the best case to look is the ARCO case, the Atlantic Richfield case, which in fact Mr. Bleacher argued. What the Supreme Court says there is that even if an injury is the direct and intended result of a price fixing conspiracy, so obviously foreseeable, it was intended in that case, it's still not antitrust injury unless the losses correspond to the reason for finding an antitrust violation in the first place. The losses have to result directly from or be inextricably intertwined with the anti-competitive aspect of the violation, not just the violation itself. Why did Judge Cote find an antitrust violation in the Apple case? Remember, because this is important, Judge Cote is the judge who presided over the Apple case. She found the price fixing conspiracy and she held in this case that the conspiracy that she found has nothing to do with the outage. She knows the circumstances of the conspiracy that she found. The reason that she found an antitrust violation in the Apple case was price fixing. She said it was a conspiracy to raise e-books prices and eliminate competition in the retail market. So in order for the plaintiffs to demonstrate antitrust injury, what they have to do is show that their loss was caused by price fixing. That was the anti-competitive aspect of the conduct. That was the reason for finding an antitrust violation. If you look through, if you read the briefs carefully, I don't think you will find anywhere where they even attempt to say that whatever losses they experienced from the outage somehow result from price fixing. Nor could they. Because the outage was just a sort of logistical delay in getting products online that affected some retailers. Prices were fixed uniformly for every retailer. Most retailers did not, many retailers did not experience any outage. Even some independent retailers did not experience any outage. And to the extent there was an outage, it just involved the timing at which the wholesalers could get the agency titles back on the shelves. It did not have anything to do with the uniform pricing of e-books. And it was the alleged price fixing that was the basis of the violation. So the outage does not and cannot satisfy the antitrust injury requirement. And it's important for causation as well. We've got two hurdles they've got to jump over, right? Antitrust injury and causation. But when you get to causation, the but-for and the material cause that they have to show is the antitrust injury. It has to be the same harm that satisfies the antitrust injury requirement has to then be a but-for and material cause of their losses. And again, their losses, according to Diesel here, are that four years after the agency system was introduced, their business failed. They say, well, that's all because of agency pricing, even though we liked agency pricing at the time. But they can't say, they cannot show causation even based on an outage because the outage does not meet the antitrust injury requirement. And so they cannot make that link. Thank you, Mr. Chief. I'm sorry, you done? If you're done, I'm done. Thank you. I think we are. Thank you, Mr. Silbert. And Mr. Ho, you've reserved three minutes for rebuttal. Thank you, Judge Hall. Let me start where Mr. Silbert left off and correct one point, which is on a motion for summary judgment that raises antitrust injury and causation, it is not necessary for us to show that the entire company went out of business because of the defendant's conspiracy. What's at issue here is whether the plaintiff suffered some economic harm from the antitrust violation and the question of how much harm is a matter for damages on which the defendants did not move. That I think is a full response to many of the alternative cause arguments that the defendants have raised because, again, we don't have to disprove every single one of those potential causes to survive summary judgment on these issues. Second, let me— On the outage question, are the damages the result of price fixing? Thank you, Judge Chin, for asking that because I was going to correct that mischaracterization as my second point. Judge Coate said specifically that there were two aspects, two anti-competitive aspects to the conspiracy. One was to try to raise prices for sure, but the other was to eliminate retail price competition. Remember that the whole reason that the publishers and Apple got together was that Apple wanted to get rid of retail price competition by other retailers. So it is well within the ambit of that anti-competitive effect and the antitrust injury to allow a set of harms that are caused when the agency conspiracy then shuts off the supply of e-books and prohibits clients like mine and Mr. Bleacher's from engaging in retail competition in the e-book market. And as Your Honors have suggested, it doesn't have to be directly linked to the antitrust violation. The standard that I think is most apt here is the Brunswick case, which said that the injury has to be caused by the violation itself or by anti-competitive acts made possible by the violation. I think our case falls squarely within that. The violation was the agreement, but then what flowed from that was the immediate cut off of all the e-book retailers without warning except to Apple, which got a head start because it was, of course, in on the conspiracy. Finally, Mr. Silbert again paints a picture of comments that Mr. Redford and others made and makes it sound as if they were unqualifiedly supportive of agency. And I would again just ask the Court to look at the actual documents in the record. They talk about the pros and the cons of agency, talking about price changes, quote, for better and for worse. And what they are are blog posts that constitute, they're partly designed to be informative, they're partly designed to be entertaining, they're partly designed to be kind of looking at the industry and trying to figure out where it's going to go. It is nothing like the kind of conclusive evidence that the Supreme Court has demanded and that this Court has demanded as well. Thank you, Mr. Ho. Thank you very much. Mr. Ho, thanks again to all of you for your fine arguments in these two cases. Thank you. Not surprisingly, we will take this under advisement. Thank you.